BRENDON WOODS (CA SBN #189910)
Public Defender
RAHA JORJANI (CA SBN #240941)
Managing Immigration Attorney
KELSEY MORALES (CA SBN #312362)
Immigration Attorney
Office of the Alameda County Public Defender
312 Clay Street, 2nd Floor
Oakland, CA 94607
Telephone: 510 268-7401
Facsimile: 510 268-7462
Email: raha.jorjani@acgov.org

*Pro Bono Attorneys for Petitioner*

U.S. DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO AGUILAR GARCIA, | Case No.: _____ |
| Petitioner, | |
| vs. | PETITION FOR WRIT OF HABEAS CORPUS |
| POLLY KAISER, Acting Field Office Director of San Francisco Office of Detention and Removal, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security; | IMMIGRATION CASE |
| TODD M. LYONS, Acting Director, Immigration and Customs Enforcement, U.S. Department of Homeland Security; | |
| Kristi NOEM, Secretary, U.S. Department of Homeland Security; and | |
| PAM BONDI, Attorney General of the United States; | |
| Respondents. | |

PETITION FOR WRIT OF HABEAS CORPUSIMMIGRATION CASE

# INTRODUCTION

1. Petitioner, Ricardo AGUILAR GARCIA, brings this petition for writ of habeas corpus, and accompanying motion for temporary restraining order, to prevent Respondents-Defendants, the Department of Homeland Security ("DHS" or "the Department") and Immigration and Customs Enforcement ("ICE") from unlawfully re-detaining him at a last-minute scheduled check-in with immigration authorities, in violation of the Fifth Amendment to the U.S. Constitution.

2. Mr. Aguilar Garcia was previously in ICE custody for nearly a year from July 2018 to July 2019. He was released by ICE on a $8,000 bond and under an order of supervision. His terms of supervision initially included electronic monitoring through an ankle bracelet but that condition was removed in February 2022. Since his release in July 2019, Petitioner has remained out of custody and complied with reporting requirements.

3. On June 13, 2025 at 2:18 PM, Mr. Aguilar Garcia received notification on the BI SmartLINK application on his phone that the Intensive Supervision Appearance Program (ISAP) is requiring him to report to the ISAP office in person in San Francisco, California either tomorrow June 14, 2025 or on Sunday, June 15, 2025. No reason was given for this added last-minute reporting and ISAP did not respond to undersigned counsel and Petitioner's inquiries regarding the purpose of the in-person check in.

4. Mr. Aguilar Garcia currently supports his U.S. Citizen wife, Heaven Ramos, and her son, who is now his U.S. Citizen step-child. His wife was diagnosed with Lupus – a chronic illness - in 2020 and undergoes treatment and monitoring for that condition. She is currently experiencing symptoms related to her medical condition and Mr. Aguilar Garcia was driving his wife to the emergency room when he received the ISAP notification on June 13, 2025.

5. Mr. Aguilar Garcia now fears that he will be re-detained this weekend when he presents himself in-person at the ISAP office in San Francisco as instructed.

6. It is well established that Mr. Aguilar Garcia has a liberty interest in his current freedom, and the Fifth Amendment's Due Process Clause mandates that detention serve a legitimate purpose – to mitigate flight risk and/or prevent danger to the community – neither of which would be served by Mr. Aguilar Garcia's detention. Moreover, the fact that Mr. Aguilar Garcia has been out on an ICE bond for nearly *six years* entitles him to certain procedural protections before he can be re-detained.

## JURISDICTION

7. This action arises under the Constitution of the United States, the INA, 8 USC Section 1101 *et seq.*, and the Administrative Procedure Act ("APA"), 5 USC Section 500 *et seq.*

8. Jurisdiction is proper under 28 U.S.C. Section 1331 (federal question), 28 U.S.C. Section 2241, Article I, Section 9, Clause 2 of the United States Constitution (habeas corpus), 28 U.S.C. Sections 2201-2202 (Declaratory Judgement Act), and the Suspension Clause of Article 1 of the U.S. Constitution. The United States has waived its sovereign immunity pursuant to 5 U.S.C. Section 702.

9. This Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. Sections 2241, 1651, 2201-02, and 5 U.S.C. Section 702. This Court also has broad equitable powers to grant relief to remedy a constitutional violation. *See Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020).

## VENUE

10. Venue is properly before this Court pursuant to 28 USC Section 1391(e) because Respondents are employees or officers of the United States, acting in their official capacity because a substantial part of the events or omissions giving rise to the claim occurred or will

occur in the Northern District of California; because Petitioner resides in this District; and because there is no real property involved in this action. *See* 28 U.S.C. § 1391(e)(1)(A).

## INTRADISTRICT ASSIGNMENT

11. Mr. Aguilar Garcia would be re-detained by the San Francisco Field Office of ICE. Therefore, the assignment to the San Francisco or Oakland Division of this Court is proper under N.D. Local Rule 3-2(d).

## PARTIES

12. Petitioner RICARDO AGUILAR GARCIA was born in Mexico and has lived in the United States since 1997, when he was approximately 3 years old.

13. Respondent POLLY KAISER is the Acting Field Office Director of ICE, in San Francisco, California, and is named in her official capacity. She maintains her office in San Francisco, California, within this judicial district. The San Francisco Field Office is responsible for carrying out ICE's immigration detention operations throughout Northern California, where Mr. Aguilar Garcia currently resides. Respondent Kaiser is a legal custodian of Mr. Aguilar Garcia.

14. Respondent TODD M. LYONS is the Acting Director of ICE and is named in his official capacity. ICE, a component of the DHS, is responsible for detaining and removing noncitizens according to immigration law and oversees custody determinations. Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the civil detention of immigrants. Respondent Lyons is a legal custodian of Mr. Aguilar Garcia.

15. Respondent KRISTI NOEM is the Secretary of the DHS and is named in her official capacity. She has authority over the detention and departure of noncitizens, because she administers and enforces immigration laws pursuant to Section 402 of the Homeland Security Act of 2002. Given this authority, Respondent Noem is the ultimate legal custodian over Mr. Aguilar Garcia and is empowered to carry out any administrative order against him.

16. Respondent PAMELA BONDI is the Attorney General of the United States and the most senior official at the Department of Justice and is named in her official capacity. As such, she is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the BIA.

## STATEMENT OF FACTS

17. Mr. Aguilar Garcia is thirty-one years old and lives in Hayward, California. Exhibits in Support of Emergency Habeas Petition and Motion for Ex Parte Temporary Restraining Order (hereinafter "Exhibit"), Exhibit A.

18. Mr. Aguilar Garcia was placed in removal proceedings in 2018 and charged as removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). He was ordered removed by the Immigration Judge in 2018 and his appeal was denied by the Board of Immigration Appeals (BIA) in 2019. His motion to reopen before the BIA was similarly denied. Petitioner thereafter sought review by the U.S. Court of Appeals for the Ninth Circuit of both BIA decisions.

19. Despite denying Mr. Aguilar Garcia's petitions for review, the Ninth Circuit granted his motion to stay issuance of the mandate in that case for ninety (90) days from May 23, 2025, to allow him to seek reopening of his case before the Board of Immigration Appeals (BIA) based on his newfound eligibility for relief from removal. *Id.* As such, Mr. Aguilar Garcia's removal is currently prohibited by an order of the U.S. Court of Appeals for the Ninth Circuit until at least August 20, 2025. Exh. F.

20. On April 10, 2025, Mr. Aguilar Garcia married Heaven Ramos, a U.S. Citizen. Exh. J. Through that marriage, he has become a step-father to Heaven's five-year-old child, M.J.L. Mr.

Aguilar Garcia is currently supporting his wife by paying the rent for her apartment in full as she is a full-time student and not working. He and Ms. Ramos are in the process of looking for an apartment in the Bay Area to move into together for the first time as a now married couple.

21. Mr. Aguilar Garcia's wife was diagnosed with a long term and chronic illness – Lupus – in 2020. Exh. I. Lupus is an autoimmune disease in which the immune system attacks its own tissues. *Id.* It can cause problems with a person's skin, kidneys, heart, lungs, nerves or blood cells. *Id.* When a person is having "lupus symptoms" they are having "flares" or "relapses." *Id.* As a result of the diagnosis, Mr. Aguilar Garcia's wife was advised that "Lupus may get worse very quickly" and that "[t]here is no way to tell when a flare will happen or how bad it will be." *Id.* Doctors advise that people with Lupus do not do too many activities and reduce stress. *Id.*

22. Mr. Aguilar Garcia was detained by DHS from July 26, 2018 through July 3, 2019. Exh. A. Immigration and Customs Enforcement released him on an $8,000 bond and under an order of supervision in July 2019, days after Mr. Aguilar Garcia filed a Habeas Petition challenging his continued detention as unlawful. *Id.* As a result of ICE's implicit finding that Mr. Aguilar Garcia did not present a flight risk or danger such that he could be released on bond, Mr. Aguilar Garcia submitted a notice of voluntary dismissal to the Court on July 25, 2019. *See Aguilar-Garcia v. Barr*, Docket 1:19-cv-03574-RMI, ECF Doc. 6.

23. Mr. Aguilar Garcia was initially released on an ankle bracelet but reported regularly as required and his ankle bracelet was removed on February 2, 2022. Exh. A.

24. Mr. Aguilar Garcia's only conviction in the United States was for a misdemeanor DUI committed in 2018. Exh. A. He accepted a plea in 2019 and that plea was set aside in 2022 pursuant to Cal. Penal Code 1203.4. *Id.* Mr. Aguilar Garcia's only other criminal case was when

he was charged with carrying a firearm in 2017. *Id.* However, that case was dismissed in full in 2019. *Id.*

25. Mr. Aguilar Garcia has not suffered any charges or convictions since his release from detention in 2019.

26. Mr. Aguilar Garcia was granted status under the Deferred Action for Childhood Arrivals (DACA) Program from 2013 to 2015. *Id.*

27. When USCIS recently began accepting new DACA applications, Mr. Aguilar Garcia filed a new application that was received by USCIS on May 9, 2025. Exh. G.

28. Mr. Aguilar Garcia's marriage to Heaven Ramos also means that he is not eligible for relief from removal in the form of Cancellation of Removal, particularly given Ms. Ramos's health condition. Exh. A. Ms. Ramos has also filed an I-130 on behalf of Mr. Aguilar Garcia. Exh. H.

29. On March 17, 2025 Mr. Aguilar Garcia received a notice to report to ICE, as well as to the Intensive Supervision Appearance Program (ISAP) on March 19, 2025. Exh. A. He complied with that request. His next check-in with ICE was scheduled for May 1, 2025.

30. Mr. Aguilar Garcia was instructed on March 19, 2025 to come back for an in-person check-in with ISAP approximately two weeks later on April 2, 2025. *Id.* He complied with that request. He was also instructed to upload a photograph of his face on the BI SmartLINK application every Wednesday morning. *Id.* He has also complied with those requirements.

31. On May 1, 2025, Mr. Aguilar Garcia again presented himself to the ICE office as required. *Id.* He was scheduled for his next check-in with ICE on August 1, 2025. *Id.*

32. On the afternoon of June 13, 2025, Mr. Aguilar Garcia received notification on his phone to "report to the San Francisco ISAP Office at 478 Tehama Street, San Francisco…between the

hours of 8:00am – 4:00pm on Saturday, June 14, 2025, or Sunday, June 15, 2025." Exh. A and B.

33. At the time that Mr. Aguilar Garcia received this notice, he was driving his wife to the emergency room. Exh. A. Ms. Ramos was admitted to the emergency room at approximately 2:33 PM on June 13, 2025. Exh. A, D. As of the latest update on June 13, 2025, she has been referred to speak with a Cardiovascular Specialist regarding a heart monitor. Exh. A.

34. Mr. Aguilar Garcia has never been asked to report to ICE during a weekend. Exh. A.

35. Mr. Aguilar Garcia responded using the BI SmartLINK Application – which he has used before to communicate with his ISAP officer – asking what the purpose was for the request to report in-person. *Id.* He was not provided with any response. Exh. A.

36. According to recent reports, ICE is using mandatory ISAP check-ins as a vehicle to make sweeping arrests. While these have historically been routine appointments to ensure compliance with supervision requirements, they have increasingly become a pretext to detain non-citizens and transfer them to immigration custody. Just last week, on June 4, at least 15 people, including a three-year-old child, were detained at the San Francisco Immigration Court during scheduled check-ins.[1] On June 7, ICE itself reported 44 people were "administratively arrested" in Los Angeles, some of whom were held overnight in federal-building-basements.[2] Similar incidents

---

[1] Jessica Flores, *ICE arrests 15 people, including 3-year-old child, in San Francisco, advocates say*, SF Chronicle, June 5, 2025, https://www.sfchronicle.com/bayarea/article/ice-arrests-sf-immigration-trump-20362755.php

[2] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight,* CBS News, June 7, 2025, https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

8

have been reported across California and around the country, including New York,[3] Washington,[4] Ohio,[5] and Alabama.[6] This pattern marks the agency's efforts to meet the Trump administration's recently-set quota of at least 3,000 arrests per day.[7] ICE's recent record of 2,200 immigrant arrests in one day illustrates DHS's advancement toward that goal.[8]

37. This is in fact what recently happened to another client of the Office of the Alameda County Public Defender. Exh. C. The client had been released in 2023 on a low Immigration Bond. On May 27, 2025, the client had received a notice to present himself the next day for an in-person ISAP appointment. *Id.* When he appeared at that appointment, he was immediately detained by ICE. *Id.* Neither client nor his attorney were notified of any breach of the IJ's 2023 grant of bond. *Id.*

38. Mr. Aguilar Garcia fears that ICE will detain him when he reports in person as required by ICE this weekend - on June 14, 2025 or June 15, 2025. Exh. A. He fears that if he is re-

---

[3] Gwynne Hogan, *ICE Turns Required Check-Ins Into Arrest Dragnet in Lower Manhattan*, The City, June 3, 2025, https://www.thecity.nyc/2025/06/03/ice-arrest-dragnet-manhattan/.
[4] Alexandra Duggan, *Two immigrants came here legally. They were detained anyway, sparking Spokane's mass ICE protest,* The Spokesman Review, June 12, 2025, https://www.spokesman.com/stories/2025/jun/12/two-refugees-came-here-legally-they-were-detained-/.
[5] Doc Louallen, *Cincinnati high school graduate faces deportation after routine ICE check-in,* ABC News, June 9, 2025, https://abcnews.go.com/US/cincinnati-high-school-graduate-faces-deportation-after-routine/story?id=122652262.
[6] Lisa Crane, *Routine check-ins in Birmingham lead to ICE detentions, Sen. Tuberville confirms,* WVTM13, June 13, 2025, https://www.wvtm13.com/article/ice-roundups-in-alabama-leave-family-members-distraught/65050505.
[7] Julia Ainsley, Laura Strickler and Didi Martinez, *ICE arrests record number of immigrants in single day, including hundreds at scheduled appointments,* NBC News, June 5, 2025, https://www.nbcnews.com/politics/national-security/ice-arrests-record-number-immigrants-single-day-rcna210817.
[8] *Id.*

detained, he will not be able to continue caring for his wife who is not only diagnosed with a serious medical disorder, but who is currently experiencing symptoms and had to be taken to the emergency room on June 13, 2025. *Id.*

## ARGUMENT

**A. Mr. Aguilar Garcia Has a Protected Liberty Interest in His Conditional Release.**

39. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. For the last nearly six years, Mr. Aguilar Garcia has exercised that freedom after ICE released him on an $8,000 bond and under an order of supervision. Exh. A. While that freedom *may* ultimately be revocable should circumstances materially change, he nonetheless retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding re-incarceration. *See Young v. Harper*, 520 U.S. 143, 146-47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482-83 (1972); *see also Ortega v. Bonnar*, 415 F.Supp.3d 963, 969-70 (N.D. Cal. 2019) (holding that a noncitizen has a protected liberty interest in remaining out of custody following an IJ's bond determination).

40. In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee has in "his continued liberty." 408 U.S. at 481-82. The Court observed that subject to parole conditions, "[a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id.* at 482. The Court further noted that when freed, "the parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* Given this, the Court reasoned that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parole and often others." *Id.* In turn, "[b]y whatever name, the liberty is valuable and *must* be seen within the protection of the

[Constitution]." *Id.* (emphasis added).

41. *Morrissey*'s basic principle—that individuals have a liberty interest in their conditional release—has been reinforced by both the Supreme Court and circuit courts on numerous occasions. See *Young*, 520 U.S. at 152 (holding that individuals released into a pre-parole program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); *Gagnon*, 411 U.S. at 781-82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process); *Zadvydas*, 533 U.S. at 690 (holding that due process protects "all 'persons' within the United States . . . whether their presence here is lawful, unlawful, temporary or permanent" who face immigration detention). As the First Circuit has explained, when analyzing the issue of whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted); *see also, e.g., Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) (noting that "a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated) (citing *Young*, 520 U.S. at 152, *Gagnon*, 411 U.S. at 782, and *Morrissey*, 408 U.S. at 482).

42. Here, when this Court "compar[es] the specific conditional release in [Mr. Aguilar Garcia's case], with the liberty interest in parole as characterized by *Morrissey*," it is clear that they are on all fours. See *Gonzalez-Fuentes*, 60 F.3d at 887. Just as in *Morrissey*, Mr. Aguilar Garcia's release "enables him to do a wide range of things open to persons" who are not in custody including to live at home, work, attend church, and "be with family and friends and to form the enduring attachments of normal life." *See Morrissey*, 408 U.S. at 482. Since his release from immigration custody nearly 6 years ago, Mr. Aguilar Garcia met his life partner, got married, and became a stepfather. Exh. A.

43. As the following section makes clear, the process he is entitled to must occur prior to any re-detention.

**B. Mr. Aguilar Garcia's Liberty Interest Requires that He Receive a Hearing *Before* Any Re-arrest and Revocation of Bond.**

44. The Supreme Court "usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property" *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). This is so even in cases where that freedom is lawfully revocable. *See Hurd*, 864 F.3d at 683 (emphasis added) (citing *Young*, 520 U.S. at 152 (re-detention after pre-parole conditional supervision requires pre-deprivation hearing)); *Gagnon*, 411 U.S. at 782 (holding the same, in context of probation); *Morrissey*, 408 U.S. 471 (holding the same, in context of parole). Only in a "special case," where post-deprivation remedies are "the only remedies the State could be expected to provide," can post-deprivation process satisfy the requirements of due process. *Zinermon*, 494 U.S. at 128.

45. Because in this case, the provision of a pre-deprivation hearing is both possible and valuable to prevent an erroneous deprivation of liberty, Mr. Aguilar Garcia must be provided with both notice and a hearing prior to any re-incarceration and revocation of his bond. *See Morrissey*, 408 U.S. at 481-82; *Haygood*, 769 F.2d at 1355-56; *Jones*, 393 F.3d at 932; *Zinermon*, 494 U.S. at 985; *See also Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982); *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail unless and until there has been a determination as to whether they can ultimately be recommitted). Mr. Aguilar Garcia has a protected liberty interest in his freedom, and before Respondents may deprive him of that, the Fifth Amendment requires they first prove that they have a lawful basis to do so.

46. As detailed above, Mr. Aguilar Garcia's release pending his removal proceedings "includes many of the core values of unqualified liberty," such as the ability to wake up in his own home, to live with his family, to foster lasting relationships, to work and support his wife

and stepchild, and to receive adequate medical care. *See Morrissey*, 408 U.S. at 482. Moreover, because Mr. Aguilar Garcia faces *civil detention*, "his liberty interest is arguably greater than the interest of the parolees in *Morrissey*." *See Ortega v. Bonnar*, 415 F.Supp.3d 963, 970 (N.D. Cal. 2019). As someone at risk of civil detention, therefore, "it stands to reason that [Mr. Aguilar Garcia] is entitled to protections at least as great as those afforded to an individual . . . accused but not convicted of a crime." *See Jones*, 393 F.3d at 932.

47. Thus, before DHS may again deprive him of his liberty, Mr. Aguilar Garcia is entitled to a hearing at which he can argue why such detention would be unlawful. Here, that would mean a hearing before a neutral decision maker who would review an updated record that includes new evidence with respect to his conduct since being released. Indeed, much has changed in Mr. Aguilar Garcia's life since he was released on bond. For example, he is now married to a U.S. Citizen and a father to his stepson. He also is being relied on by his wife who suffers from a serious and long-term illness and whom he was driving to the emergency room at the time he received the notice that was to report to ICE in person this very weekend.

48. Multiple courts in this district have found that in certain cases, due process requires granting a hearing before the DHS may re-detain a noncitizen who they have already freed. In *Ortega v. Bonnar*, another court in this district held that a petitioner was entitled to a pre-deprivation hearing in front of an IJ prior to being re-detained. In *Ortega*, the petitioner was released on a $35,000 bond, and after the Board of Immigration Appeals affirmed his removal order, the DHS claimed that this constituted a material change in circumstances such that they could unilaterally re-detain him without any process. 415 F. Supp. 3d 963, 971 (N.D. Cal. 2019). The court in *Ortega* disagreed, explaining that "just as people on preparole, parole, and probation status have a liberty interest, so too does [petitioner] have a liberty interest in remaining out of custody on bond." *Id.* at 969 (citing *Morrissey*, 408 U.S. at 482; *Gagnon*, 411 U.S. at 782). As a result, having already granted a preliminary injunction, the court permanently enjoined ICE from re-arresting the petitioner "unless and until a hearing, with adequate notice, is held in

Immigration Court to determine whether his bond should be revoked or altered." *Id*. at 970.

49. More recently, in *Ortiz Vargas*, the court considered the case of a petitioner who was released on a $10,000 bond after the IJ determined that he was not subject to mandatory detention, and was neither a danger nor such a flight risk that no amount of money could mitigate. *Ortiz Vargas v. Jennings*, 2020 WL 5074312, at *1 (N.D. Cal. 2020) (order granting temporary restraining order). A month after being released on bond, the IJ *sua sponte* issued an order reconsidering her decision and revoking bond, concluding that she had erred in concluding that the petitioner was not subject to mandatory custody. *Id.* Mr. Ortiz sought injunctive relief to avoid his re-arrest and the court granted a preliminary injunction on behalf of the petitioner finding that there were "serious questions going to the merits of his claim that he has a protectable liberty interest in his conditional release under Morrissey and that he must be afforded a pre-deprivation hearing if respondents seek to re-arrest him." 2020 WL 5517277, at *2 (N.D. Cal. 2020) (order granting preliminary injunction). As a result, the court enjoined Respondents from "re-arresting or re-detaining petitioner . . . unless and until an administrative hearing, with adequate notice, is held to determine whether petitioner is subject to mandatory detention." *Id*. at *3.

50. Then, in *Jorge M.F.*, the petitioner was released on a $3,000 bond after the IJ determined that he was neither a danger to the community nor a flight risk. *Jorge M.F. v. Wilkinson*, 2021 WL 783561, at *1 (N.D. Cal. 2021) (order granting temporary restraining order). Six months after being released on bond, the Board vacated the IJ's decision and ordered the Petitioner "detained on no bond." *Id*. In *Jorge M.F.*, the court held that the Petitioner "has a substantial private interest in remaining on bond" even though his bond had been revoked by the Board. *Id*. at *3; *see also Romero v. Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1443250, at *3-4 (N.D. Cal. May 6, 2022) (Petitioner would suffer irreparable harm if re-detained, and required notice and a hearing before any re-detention); *Meza v. Bonnar*, No. 18-cv-02708-BLF at ECF-15, 2018 WL 2554572, at *1 (N.D. Cal. June 4, 2018) (Petitioner "ha[d] a vested liberty interest in her current

conditional release," and required a pre-deprivation hearing at which she could argue why such re-detention would be unlawful.).

51. Just as in the above cases, Mr. Aguilar Garcia is entitled to a hearing prior to any re-detention by ICE.

52. In ordering the hearing in *Jorge M.F.*, the district court made clear that the government bears the burden of proving by clear and convincing evidence that a noncitizen should be re-detained. *See Jorge M.F. v. Jennings*, 534 F.Supp.3d 1050, 1057 (N.D. Cal. Apr. 14 (2021).

53. In addition, a great weight of authority has confirmed that the government bears the burden of proving by clear and convincing evidence that a noncitizen should be re-detained. *See, e.g., Doe v. Becerra*, No. 23-cv-05327-RMI, 2024 WL 1018519, at *6 (N.D. Cal. Mar. 7, 2024) (holding that "the government shall bear the burden of proving by clear and convincing evidence that Petitioner's continued detention is warranted"); *Hilario M.R. v. Warden*, No. 1:24-cv-00998-EPG-HC, 2025 WL 1158841, at *11 (E.D. Cal. Apr. 21, 2025) ("The Court holds that the government must justify Petitioner's continued confinement under § 1231(a) by clear and convincing evidence that Petitioner is a flight risk or a danger to the community.); *See Juarez v. Choate*, No. 1:24-cv-00419-CNS, 2024 WL 1012912, at *8 (D. Colo. Mar. 8, 2024) (holding that "the government will bear the burden to show by clear and convincing evidence that continued detention is justified" at bond hearing ordered for § 1231(a) detainee). This court should come to the same conclusion.

## CAUSES OF ACTION

### COUNT ONE

**Violation of the Substantive Component of the Due Process Clause of the Fifth Amendment**

1. Mr. Aguilar Garcia re-alleges and incorporates by reference the paragraphs above.

2. Respondents' re-detention of Mr. Aguilar Garcia would violate Mr. Aguilar Garcia's rights guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

3. Civil detention is warranted only to mitigate flight risk or prevent danger to the community. *See Zadvydas*, 533 U.S. at 682 (citing 8 USC § 1231(a)(6)). As ICE determined Mr. Aguilar Garcia's eligibility for release in July 2019, and given that Mr. Aguilar Garcia has complied with the terms of his supervised release for nearly six years since then, neither purpose would be met here if Mr. Aguilar Garcia were to be detained.

4. As such, Respondents have no authority to re-detain Mr. Aguilar Garcia.

## COUNT TWO

**Violation of the Procedural Component of the Due Process Clause of the Fifth Amendment**

5. Mr. Aguilar Garcia re-alleges and incorporates by reference the paragraphs above.

6. The Due Process Clause of the Fifth Amendment forbids the government from depriving any person of liberty without due process of law. U.S. Const. Amend. V.

7. Mr. Aguilar Garcia has a vested liberty interest in his current conditional release, and Due Process does not permit the government to strip him of that liberty without his having the opportunity to argue against his re-detention *prior* to that re-detention taking place. *See Morrissey*, 408 U.S. at 487-488. Specifically, Mr. Aguilar Garcia should be entitled to a hearing before a neutral decision maker who would decide whether the government has shown by clear and convincing evidence that there has been a material change in circumstances since his release, and second, assuming there is a material change, whether the government can show by clear and convincing evidence that such a change warrants a alteration of Petitioner's current custody status. *See Sugay*, 17 I&N Dec. at 640; *Ortega*, 415 F.Supp.3d at 969-70.

8. For these reasons, Mr. Aguilar Garcia's re-detention without a pre-deprivation hearing would violate the Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Aguilar Garcia requests this Court grant the following relief:

1. Exercise jurisdiction over this matter;

2. Enjoin Respondents from re-arresting Mr. Aguilar Garcia, unless and until a hearing is held in which it is determined that his re-detention would be lawful under the Fifth Amendment and controlling statutes and regulations;

3. Declare that Respondents may not re-arrest Mr. Aguilar Garcia, unless and until a hearing is held in which it is determined that his re-detention would be lawful under the Fifth Amendment and controlling statutes and regulations;

4. Enjoin Respondents from re-detaining Mr. Aguilar Garcia because any re-detention would violate his substantive due process rights under the Fifth Amendment;

5. Declare that Respondents may not re-detain Mr. Aguilar Garcia because any re-detention would violate his substantive due process rights under the Fifth Amendment;

6. Award reasonable costs and attorney fees; and

7. Grant further relief as the Court deems just and proper.

Dated: June 14, 2025                Respectfully submitted,

                                    */s/Raha Jorjani*
                                    Raha Jorjani
                                    Kelsey Morales
                                    ALAMEDA COUNTY PUBLIC DEFENDER'S OFFICE

                                    *Pro bono attorneys for Petitioner*