BRENDON WOODS (CA SBN #189910)
Public Defender
RAHA JORJANI (CA SBN #240941)
Managing Immigration Attorney
KELSEY MORALES (CA SBN #312362)
Immigration Attorney
Office of the Alameda County Public Defender
312 Clay Street, 2nd Floor
Oakland, CA 94607
Telephone: 510 268-7429
Facsimile: 510 268-7462
Email: kelsey.morales@acgov.org

*Pro Bono Attorneys for Petitioner*

U.S. DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO AGUILAR GARCIA,<br><br>       Petitioner,<br><br>vs.<br><br>POLLY KAISER, Acting Field Office Director of San Francisco Office of Detention and Removal, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security;<br><br>TODD M. LYONS, Acting Director, Immigration and Customs Enforcement, U.S. Department of Homeland Security;<br><br>Kristi NOEM, Secretary, U.S. Department of Homeland Security; and<br><br>PAM BONDI, Attorney General of the United States;<br><br>       Respondents. | Case No.: _____<br><br>PETITIONER'S NOTICE OF MOTION AND EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES |

PETITIONER'S NOTICE OF MOTION AND EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES

# EX PARTE MOTION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Local Civil Rules 7-1 and 7-10, Petitioner hereby moves this Court for a temporary restraining order to be issued ex parte. Petitioner moves this Court for an order temporarily enjoining Respondent's Department of Homeland Security (DHS), their agents, employees, and successors in office from re-detaining him until such time as he has had an opportunity to challenge his re-detention before a neutral decisionmaker and such decision maker has determined that his re-detention would be lawful. Petitioner was released from immigration custody nearly six years ago. Petitioner request that the Court rule on this Motion as soon as possible, and without a response from the government.

As outlined in his Petition for Writ of Habeas Corpus, there is a substantial and immediate risk that Mr. Aguilar Garcia will be re-detained by Respondents at an in-person check-in this weekend (that he was notified about yesterday), in light of recent reports of that ICE is using check-ins as a vehicle to make sweeping arrests.

Because Petitioner's re-detention could take place within the next 40 hours, and will result in immediate irreparable injury, not only to Petitioner but to his U.S. Citizen wife and step-son, an ex parte temporary restraining order is appropriate in this case. *See* Fed. R. Civ. Proc. 65(b)(1).

At 3:49 PM on June 13, 2025, undersigned counsel notified the Civil Division Chief of the U.S. Attorney's Office of Petitioner's intent to file the instant Emergency Habeas and Motion for Temporary Restraining Order unless ICE could provide an assurance that Petitioner would not be detained at his upcoming check in this weekend. Exhibits in Support of Emergency Habeas Petition and Motion for Ex Parte Temporary Restraining Order (hereinafter "Exhibit"), Exhibit A. At the time of this filing, no such assurance had been provided. *Id.*

Absent immediate relief from this Court, Petitioner's re-arrest and re-incarceration without notice and a hearing on whether such re-detention is justified would violate Petitioner's right to Due Process.

Dated: June 14, 2025      Respectfully submitted,

*/s/Raha Jorjani*
Raha Jorjani
Kelsey Morales
ALAMEDA COUNTY PUBLIC DEFENDER'S OFFICE

*Pro bono attorneys for Petitioner*

## MEMORANDUM OF POINTS AND AUTHORITIES

Petitioner, Ricardo AGUILAR GARCIA, brings this ex parte motion for a temporary restraining order ("TRO") to enjoin Respondents from re-detaining him at his upcoming in-person check-in with immigration authorities.

## STATEMENT OF FACTS

Mr. Aguilar Garcia is thirty-one years old and lives in Hayward, California. Exhibit A. He was placed in removal proceedings in 2018 and charged as removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). He was ordered removed by the Immigration Judge in 2018 and his appeal was denied by the Board of Immigration Appeals (BIA) in 2019. His motion to reopen before the BIA was similarly denied. Petitioner thereafter sought review by the U.S. Court of Appeals for the Ninth Circuit of both BIA decisions.

Despite denying Mr. Aguilar Garcia's petitions for review, the Ninth Circuit granted his motion to stay issuance of the mandate in that case for ninety (90) days from May 23, 2025, to allow him to seek reopening of his case before the BIA based on his newfound eligibility for relief from removal. *Id.* As such, Mr. Aguilar Garcia's removal is currently prohibited by an order of the U.S. Court of Appeals for the Ninth Circuit until at least August 20, 2025. Exh. F.

On April 10, 2025, Mr. Aguilar Garcia married Heaven Ramos, a U.S. Citizen. Exh. J. Through that marriage, he became a step-father to Heaven's five-year-old child, M.J.L. Mr. Aguilar Garcia is currently supporting his wife by paying the rent for her apartment in full as she is a full-time student and not working. He and his wife are in the process of looking for an apartment in the Bay Area to move into together for the first time as a now married couple.

Mr. Aguilar Garcia's wife was diagnosed with a long term and chronic illness – Lupus – in 2020. Exh. I. Lupus is an autoimmune disease in which the immune system attacks its own

tissues. *Id.* It can cause problems with a person's skin, kidneys, heart, lungs, nerves or blood cells. *Id.* When a person is having "lupus symptoms" they are having "flares" or "relapses." *Id.* As a result of the diagnosis, Mr. Aguilar Garcia's wife was advised that "Lupus may get worse very quickly" and that "[t]here is no way to tell when a flare will happen or how bad it will be." *Id.* Doctors advise that people with Lupus do not do too many activities and reduce stress. *Id.*

Mr. Aguilar Garcia was detained by DHS from July 26, 2018 through July 3, 2019. Exh. A. In 2019, ICE released him on an $8,000 bond and under an order of supervision, days after he filed a Habeas Petition challenging his continued detention as unlawful. *Id.* As a result of his release by ICE, Mr. Aguilar Garcia moved to voluntarily dismiss that habeas petition on July 25, 2019. *See Aguilar-Garcia v. Barr*, Docket 1:19-cv-03574-RMI, ECF Doc. 6. He was initially released on an ankle bracelet but his ankle bracelet was removed on February 2, 2022. Exh. A.

Mr. Aguilar Garcia's only conviction in the United States is for a misdemeanor DUI committed in 2018. Exh. A. He accepted a plea in 2019 and that plea was set aside in 2022 pursuant to Cal. Penal Code 1203.4. *Id.* His only other criminal case was when he was charged with carrying a firearm in 2017. *Id.* However, that case was dismissed in full in 2019. *Id.* Since his release from immigration custody in 2019, he has not been charged with any new offense.

Mr. Aguilar Garcia was granted status under the Deferred Action for Childhood Arrivals (DACA) Program from 2013 to 2015. *Id.* When USCIS recently began accepting new DACA applications, he filed a new application that was received by USCIS on May 9, 2025. Exh. G. Mr. Aguilar Garcia's marriage to Heaven Ramos also means that he is not eligible for relief from removal in the form of Cancellation of Removal, particularly given Ms. Ramos's health condition. Exh. A. Ms. Ramos has also filed an I-130 on behalf of Mr. Aguilar Garcia. Exh. H.

On March 17, 2025 Mr. Aguilar Garcia received a notice to report to ICE, as well as to the Intensive Supervision Appearance Program (ISAP) on March 19, 2025. Exh. A. He complied with that request. His next check-in with ICE was scheduled for May 1, 2025. He was instructed on March 19 to return for an in-person check-in with ISAP approximately two weeks later on April 2, 2025. *Id.* He was also instructed to upload a photograph of his face on the BI SmartLINK application every Wednesday morning. *Id.* He complied with those requests. *Id.*

On May 1, 2025, Mr. Aguilar Garcia again presented himself to the ICE office as required. *Id.* He was scheduled for his next check-in with ICE on August 1, 2025. *Id.* On the afternoon of June 13, 2025, he received notification on his phone to "report to the San Francisco ISAP Office at 478 Tehama Street, San Francisco…between the hours of 8:00am – 4:00pm on Saturday, June 14, 2025, or Sunday, June 15, 2025." Exh. A and B.

At the time that Mr. Aguilar Garcia received this notice, he was driving his wife to the emergency room. Exh. A. Ms. Ramos was admitted to the emergency room at approximately 2:33 PM just yesterday, June 13, 2025. Exh. A, D. As of the latest update on June 13, 2025, she has been referred to speak with a Cardiovascular Specialist regarding a heart monitor. Exh. A.

Mr. Aguilar Garcia has never been asked to report to ICE during a weekend. Exh. A. Both he and undersigned counsel contacted ISAP to inquire as to the nature and purpose of the check in but received no response. *Id.*

According to recent reports, ICE is using mandatory ISAP check-ins as a vehicle to make sweeping arrests. While these have historically been routine appointments to ensure compliance with supervision requirements, they have increasingly become a pretext to detain non-citizens and transfer them to immigration custody. Just last week, on June 4, at least 15 people, including a three-year-old child, were detained at the San Francisco Immigration Court during scheduled

check-ins.[1] On June 7, ICE itself reported that 44 people were "administratively arrested" in Los Angeles, some of whom were held overnight in federal-building-basements.[2] Similar incidents have been reported across California and around the country, including New York,[3] Washington,[4] Ohio,[5] and Alabama.[6] This pattern marks the agency's efforts to meet the Trump administration's recently-set quota of at least 3,000 arrests per day.[7] ICE's recent record of 2,200 immigrant arrests in one day illustrates DHS's advancement toward that goal.[8]

This is in fact what recently happened to another client of the Office of the Alameda County Public Defender. Exh. C. The client had been released in 2023 on a low Immigration Bond. On May 27, 2025, the client had received a notice to present himself the next day for an

---

[1] Jessica Flores, *ICE arrests 15 people, including 3-year-old child, in San Francisco, advocates say*, SF Chronicle, June 5, 2025, https://www.sfchronicle.com/bayarea/article/ice-arrests-sf-immigration-trump-20362755.php

[2] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight,* CBS News, June 7, 2025, https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[3] Gwynne Hogan, *ICE Turns Required Check-Ins Into Arrest Dragnet in Lower Manhattan*, The City, June 3, 2025, https://www.thecity.nyc/2025/06/03/ice-arrest-dragnet-manhattan/.

[4] Alexandra Duggan, *Two immigrants came here legally. They were detained anyway, sparking Spokane's mass ICE protest,* The Spokesman Review, June 12, 2025, https://www.spokesman.com/stories/2025/jun/12/two-refugees-came-here-legally-they-were-detained-/.

[5] Doc Louallen, *Cincinnati high school graduate faces deportation after routine ICE check-in,* ABC News, June 9, 2025, https://abcnews.go.com/US/cincinnati-high-school-graduate-faces-deportation-after-routine/story?id=122652262.

[6] Lisa Crane, *Routine check-ins in Birmingham lead to ICE detentions, Sen. Tuberville confirms,* WVTM13, June 13, 2025, https://www.wvtm13.com/article/ice-roundups-in-alabama-leave-family-members-distraught/65050505.

[7] Julia Ainsley, Laura Strickler and Didi Martinez, *ICE arrests record number of immigrants in single day, including hundreds at scheduled appointments,* NBC News, June 5, 2025, https://www.nbcnews.com/politics/national-security/ice-arrests-record-number-immigrants-single-day-rcna210817.

[8] *Id.*

in-person ISAP appointment. *Id.* When he appeared at that appointment, he was immediately detained by ICE. *Id.* Neither client nor his attorney were notified of any breach of client's grant of bond. *Id.*

Mr. Aguilar Garcia fears that ICE will detain him when he reports in person as required by ICE this weekend - on June 14, 2025 or June 15, 2025. Exh. A. He fears that if he is re-detained, he will not be able to continue caring for his wife who not only suffers from a serious medical disorder, but who had to be taken to the emergency room just yesterday. *Id.*

## ARGUMENT

The standard for issuing a TRO is the same as for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain a TRO, Mr. Aguilar Garcia must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Even if he does not show a likelihood of success on the merits, the Court may still grant a TRO if Mr. Aguilar Garcia raises "serious questions" as to the merits of his claims, the balance of hardships tips "sharply" in his favor, and the remaining equitable factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

**A. Mr. Aguilar Garcia Is Likely To Succeed on the Merits of His Claim That The Constitute Requires That He Remain Out of Custody Until A Court Determines That His Re-Detention Would Be Lawful.**

Petitioner hereby incorporates by reference the full arguments and law cited in his Habeas Petition in support of his argument that he is likely to success on the merits of his case. As argued in his petition, "[f]reedom from imprisonment—from government custody, detention,

or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. For the last nearly six years, Mr. Aguilar Garcia has exercised that freedom after ICE released him on an $8,000 bond and under an order of supervision. Exh. A. While that freedom *may* ultimately be revocable should circumstances materially change, he nonetheless retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding re-incarceration. *See Young v. Harper*, 520 U.S. 143, 146-47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482-83 (1972); *see also Ortega v. Bonnar*, 415 F.Supp.3d 963, 969-70 (N.D. Cal. 2019) (holding that a noncitizen has a protected liberty interest in remaining out of custody following an IJ's bond determination).

In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee has in "his continued liberty." 408 U.S. at 481-82. The Court observed that subject to parole conditions, "[a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id*. at 482. The Court further noted that when freed, "the parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* Given this, the Court reasoned that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parole and often others." *Id.* In turn, "[b]y whatever name, the liberty is valuable and *must* be seen within the protection of the [Constitution]." *Id.* (emphasis added).

*Morrissey*'s basic principle—that individuals have a liberty interest in their conditional release—has been reinforced by both the Supreme Court and circuit courts on numerous occasions. See *Young*, 520 U.S. at 152 (holding that individuals released into a pre-parole

program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); *Gagnon*, 411 U.S. at 781-82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process); *Zadvydas*, 533 U.S. at 690 (holding that due process protects "all 'persons' within the United States . . . whether their presence here is lawful, unlawful, temporary or permanent" who face immigration detention). As the First Circuit has explained, when analyzing the issue of whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted); *see also, e.g., Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) (noting that "a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated) (citing *Young*, 520 U.S. at 152, *Gagnon*, 411 U.S. at 782, and *Morrissey*, 408 U.S. at 482).

Just as in *Morrissey*, Mr. Aguilar Garcia's release "enables him to do a wide range of things open to persons" who are not in custody including to live at home, work, attend church, and "be with family and friends and to form the enduring attachments of normal life." *See Morrissey*, 408 U.S. at 482. Since his release from immigration custody nearly 6 years ago, Mr. Aguilar Garcia met his life partner, got married, and became a stepfather. Exh. A.

The Supreme Court "usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property" *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). This is so even in cases where that freedom is lawfully revocable. *See Hurd*, 864 F.3d at 683 (emphasis added) (citing *Young*, 520 U.S. at 152 (re-

detention after pre-parole conditional supervision requires pre-deprivation hearing)); *Gagnon*, 411 U.S. at 782 (holding the same, in context of probation); *Morrissey*, 408 U.S. 471 (holding the same, in context of parole). Only in a "special case," where post-deprivation remedies are "the only remedies the State could be expected to provide," can post-deprivation process satisfy the requirements of due process. *Zinermon*, 494 U.S. at 128.

Because in this case, the provision of a pre-deprivation hearing is both possible and valuable to prevent an erroneous deprivation of liberty, Mr. Aguilar Garcia must be provided with both notice and a hearing prior to any re-incarceration and revocation of his bond. *See Morrissey*, 408 U.S. at 481-82; *Haygood*, 769 F.2d at 1355-56; *Jones*, 393 F.3d at 932; *Zinermon*, 494 U.S. at 985; *See also Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982); *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail unless and until there has been a determination as to whether they can ultimately be recommitted).

**B. Mr. Aguilar Garcia Will Suffer Irreparable Harm Absent Injunctive Relief.**

Imminent re-detention will irreparably harm Mr. Aguilar Garcia. First, re-detention will separate Mr. Aguilar Garcia from his family, causing them severe emotional, psychological, and economic hardship. As the Supreme Court has recognized, incarceration "has a detrimental impact on the individual" because "it often means loss of a job" and "disrupts family life." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). And as the Ninth Circuit has further explained, the "irreparable harms" of immigration detention include the "economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez v. Sessions*, 872 F.3rd 976, 995 (9th Cir. 2017). Mr. Aguilar Garcia's wife is a full-time student and therefore not currently employed.

Exh. A. As a result, she relies on him to pay for the full rent for her apartment while they search for an apartment to move into together given their recent marriage. *Id.*

Importantly, Mr. Aguilar Garcia's wife, was diagnosed with a long term and chronic illness – Lupus – in 2020. Exh. I. Lupus is an autoimmune disease in which the immune system attacks its own tissues. *Id.* It can cause problems with a person's skin, kidneys, heart, lungs, nerves or blood cells. *Id.* When a person is having "lupus symptoms" they are having "flares" or "relapses." *Id.* As a result of the diagnosis, she was advised that "Lupus may get worse very quickly" and that "[t]here is no way to tell when a flare will happen or how bad it will be." *Id.* Doctors advise that people with Lupus do not do too many activities and reduce stress. *Id.*

Through his marriage to Heaven Ramos, Mr. Aguilar Garica became a step-father to Heaven's five-year-old child, M.J.L. Mr. Aguilar Garcia's step-son also suffers from health challenges, including severe developmental articulation disorder and pediatric obstructive sleep apnea. Exh. A. Mr. Aguilar Garcia's wife directly relies on him for support given her and her son's health challenges. At the time that Mr. Aguilar Garcia received the notice from ISAP that he was to report in person on either June 14 or June 15, 2025, he was driving his wife to the emergency room on the advice of her doctor.

Second, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F. 3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Ninth Circuit has made clear that "[a]n alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior Court of the State of Calif.*, 739 F.2d 466, 472 (9th Cir. 1984); *Associated General Contractors of Calif., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (recognizing presumption of irreparable harm when constitutional infringement alleged). As

detailed above, Mr. Aguilar Garcia's re-arrest would violate his right to due process rights.

**C. The Balance Of Equities And the Public Interest Favor Granting A TRO.**

Where the government is the opposing party, balancing the harm and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Mr. Aguilar Garcia faces grave hardships absent a TRO, and the public has strong interests in ensuring that the executive branch follows the law, that hardship to Mr. Aguilar Garcia's family is avoided, and Mr. Aguilar Garcia's can continue to be a productive member in his community.

For Mr. Aguilar Garcia, the hardships could not be more serious. Absent injunctive relief, he faces arrest and detention in violation of his constitutional rights, separation from his family, and severe economic harm, among other things. Exh. A, D, I, J.  Faced with "preventable human suffering, [the Ninth Circuit has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.'" *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). This Court should find the same.

Particularly given his wife's overall medical condition, as well as her having to be taken to the emergency room on June 13, 2025 for a flare up of symptoms related to her medical condition, there can be little doubt as to the severity of the hardship to Mr. Aguilar Garcia and his family that would result from his re-detention.   A TRO serves the public interest by avoiding "indirect hardship to [Mr. Aguilar Garcia's] family members," which here would be substantial. *See also Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (finding that courts may consider hardship to families when determining public interest).

Furthermore, the public has an interest in upholding constitutional rights. *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in

upholding the Constitution."); *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."). The public has a strong interest in ensuring that Mr. Aguilar Garcia is not re-detained without first receiving the due process he is owed, as "it would not be equitable or in the public's interest to allow [a party] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). Without an injunction, DHS would effectively be granted permission to detain Mr. Aguilar Garcia in violation of the Constitution.

The government, on the other hand, cannot suffer harm from an injunction that simply requires it to follow the law. *See Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). Here, specifically, the government cannot claim harm from a TRO that enjoins it from re-arresting Mr. Aguilar Garcia who has been out of custody for the last six years, and orders the due process required by the Constitution and existing precedent.

## CONCLUSION

For the foregoing reasons, Mr. Aguilar Garcia respectfully requests that the Court enter a TRO enjoining ICE from re-arresting him pending further order of this Court.

Dated: June 14, 2025          Respectfully submitted,
                              /s/Raha Jorjani
                              Raha Jorjani
                              Kelsey Morales
                              ALAMEDA COUNTY PUBLIC DEFENDER'S OFFICE

                              *Pro bono attorneys for Petitioner*